RECORD NO. 14-1832

In The

# United States Court of Appeals

## For The Fourth Circuit

### TEK FUSION GLOBAL, INC.,

*Plaintiff – Appellee*,

**v.**

### GRANT A. KYLE; BLUGUISE, LLC,

*Defendants – Appellants*,

### EDMUND D. ZINK

*Defendant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT NEWPORT NEWS

―――――――――

## BRIEF OF APPELLANTS

―――――――――

Robert M. Tyler
W. Randolph Robins, Jr.
SPOTTS FAIN, PC
411 East Franklin Street, Suite 600
Richmond, Virginia  23219
(804) 697-2000

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1832__        Caption: _Tek Fusion Global, Inc. v. Grant A. Kyle, et al._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Bluguise, LLC_____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                   ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____9/2/2014_____

Counsel for: Bluguise, LLC _____

## CERTIFICATE OF SERVICE
***************************

I certify that on _____9/2/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____           _____9/2/2014_____
(signature)                          (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-1832        Caption: Tek Fusion Global, Inc. v. Grant A. Kyle, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Grant A. Kyle
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                    ☐YES ☑NO
    If yes, identify all parent corporations, including grandparent and great-grandparent
    corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
    other publicly held entity?                                        ☐YES ☑NO
    If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: _____9/11/2014_____

Counsel for: Grant A. Kyle _____

## CERTIFICATE OF SERVICE
***************************

I certify that on _____9/11/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____
(signature)

_____9/11/2014_____
(date)

- 2 -

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................... ii

JURISDICTIONAL STATEMENT ....................................................................1

ISSUE PRESENTED FOR REVIEW ..................................................................1

STATEMENT OF THE CASE.............................................................................2

    Relevant Procedural History............................................................................2

    Statement of Facts.............................................................................................3

        The Evidence of TFG's Alleged Source Code Problems .....................6

        The Preliminary Injunction ..................................................................8

SUMMARY OF THE ARGUMENT ...................................................................11

ARGUMENT .......................................................................................................12

CONCLUSION ....................................................................................................20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alberti v. Cruise*,
 383 F.2d 268 (4th Cir. 1967) ...........................................................................13

*Centro Tepeyac v. Montgomery County*,
 722 F.3d 184 (4th Cir. 2013) .........................................................................13

*CPC Int'l, Inc. v. Skippy Inc.*,
 214 F.3d 456 (4th Cir. 2000) .....................................................................13, 14

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
 952 F.2d 802 (4th Cir. 1991) ......................................................................12-13

*e360 Insight v. The Spamhaus Project*,
 500 F.3d 594 (7th Cir. 2007) .........................................................................18

*Howard Opera House Assocs. v. Urban Outfitters, Inc.*,
 322 F.3d 125 (2d Cir. 2003) ...........................................................................17

*In re Microsoft Corp. Antitrust Litig.*,
 333 F.3d 517 (4th Cir. 2003) .........................................................................13

*Johnson v. Jassi Dhillon Inc.*,
 2012 U.S. Dist. LEXIS 103244 (E.D. Cal. July 24, 2012)............................16

*Mayflower Industries v. Thor Corp.*,
 182 F.2d 800 (3d Cir. 1950) ...........................................................................13

*McClain v. Lufkin Indus., Inc.*,
 519 F.3d 264 (5th Cir. 2008) .........................................................................16

*Microstrategy Inc. v. Motorola, Inc.*,
 245 F.3d 335 (4th Cir. 2001) .........................................................................12

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) ......................................................................16

*Schmidt v. Lessard*,
414 U.S. 473 (1974)......................................................................................14

*Taylor v. Freeman*,
34 F.3d 266 (4th Cir. 1994) .........................................................................13

*United States v. South Carolina*,
720 F.3d 518 (4th Cir. 2013) .......................................................................13

## **STATUTES**

28 U.S.C. § 1292(a)(1).........................................................................................1

28 U.S.C. § 1332(a)(1).....................................................................................1, 2

28 U.S.C. § 1441(b) ............................................................................................2

## **RULES**

Fed. R. App. P. 28(a)(4)(D) ...............................................................................1

Fed. R. Civ. P. 65 ...........................................................................................9, 13

Fed. R. Civ. P. 65(d) ...................................................................................*passim*

Fed. R. Civ. P. 65(d)(1).....................................................................................13

## JURISDICTIONAL STATEMENT

The district court has jurisdiction over this matter under 28 U.S.C. § 1332(a)(1), as the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the parties are completely diverse. In its Complaint, TEK Fusion Global, Inc. ("TFG") seeks at least a million dollars in compensatory damages, among other relief. (JA 24.) TFG is a Virginia corporation with its principal place of business in Williamsburg (JA 9.) At all relevant times, Kyle has been domiciled in North Carolina (JA 274.) Bluguise is a North Carolina limited liability company with its principal place of business in Raleigh. (*Id.*) Kyle is the sole member of Bluguise. (*Id.*) Both Kyle and Bluguise ("Appellants") are therefore North Carolina citizens. Defendant Edmund D. Zink is a resident and citizen of Tennessee. (JA 45.)

Under Rule 28(a)(4)(D), Appellants assert that this Court has jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1), because it arises from the district court's July 16, 2014 Order granting a preliminary injunction. (JA 319.) Appellants timely filed their Notice of Appeal on August 15, 2014, within 30 days of the entry of the July 16, 2014 Order. (JA 324.)

## ISSUE PRESENTED FOR REVIEW

Whether the district court's July 16, 2014 Order is impermissibly vague and therefore fails to describe in reasonable detail the conduct and acts it restrains and requires, in violation of Rule 65(d) of the Federal Rules of Civil Procedure.

## STATEMENT OF THE CASE

Relevant Procedural History

On March 11, 2014, TFG filed suit against Appellants and Edmund D. Zink ("Zink") in the Circuit Court for the City of Williamsburg and County of James City (the "Circuit Court"), Case No. CL14000432-0000. Appellants timely removed the action to the United States District Court for the Eastern District of Virginia under 28 U.S.C. § 1332(a)(1) and § 1441(b), as there is complete diversity of the parties and the amount in controversy exceeds $75,000.

On April 8, 2014, TFG moved for a temporary restraining order and preliminary injunction ("TFG's Motion"). Appellants opposed TFG's Motion on April 23, 2014, and TFG filed a reply brief on April 29, 2014.

The parties consented to magistrate judge jurisdiction on May 9, 2014, and the district court heard evidence and argument on TFG's Motion on July 7, 2014. (JA 53-293.) The district court continued the hearing to July 11, 2014 (JA 294-318), at which time it made certain findings of fact and indicated that it would grant TFG's Motion in part. (JA 300-313.) On July 16, 2014, the district court entered an Order granting TFG's Motion in part. (JA 319.) Appellants timely appealed on August 15, 2014. (JA 324.)

Statement of Facts

This is a dispute about the ownership of software. (JA 166.) Grant Kyle is a software engineer who, for the last seven years, has developed geospatial mapping programs for use in civilian and military applications. (JA 274.) In June 2009, Kyle formed Bluguise LLC, a North Carolina limited liability company wholly-owned by Kyle, for the purpose of developing and owning this proprietary software, among other things. (*Id.*)

The software Kyle developed enables a person and devices, including ground-based and aircraft-mounted avionics devices, to be aware of their physical locations and the surrounding environment, including other aircraft, armament systems, and other physical objects in the air and on the ground. (*Id.*) The software produces images that are viewable on tablets, smart phones, mobile devices, and the heads-up display of aircraft. (*Id.*)

The software is comprised of five broad elements: (1) "Atlas," a "mapping engine" that is, in appearance, similar to Google Maps (also referred to as "BluMaps"); (2) "Blu Devices," which are programs that integrate information and signals received from other software programs and hardware, such as forward looking infrared devices and global positioning systems ("GPS"), into the mapping image displayed to the user; (3) "User Interfaces," which produce the visual images displayed to the user; (4) a "Video Library," which enables the capture and playback

3

of standard and high definition video; and (5) a "Data Server," which, in lay terms, is the "brain" of the system which amalgamates the information collected and processed into a final product for the user of the software. (JA 276.)

Underlying each of these elements is "source code," which, loosely defined, is a set of electronic commands written in a programming language that instructs a computer to execute certain tasks and functions. (JA 94.) Source code itself generally is not used to run computer applications; rather, source code for software is stored, compiled in machine language, and distributed to users as executable files. (JA 94.) Source code is required to update and edit those executable files. The source code at issue in this case is managed using a storage control system called Subversion or SVN. (JA 108.)

Kyle and Kelly McDougall, now TFG's President, became acquainted in approximately 2009. (JA 120.) At that point, McDougall had recently resigned from a company called ForceX, Inc. (*Id.*) Bluguise began working with McDougall, and his company Technology Fusion, LLC, in approximately 2010. (JA 275.) The relationship began with Bluguise supplying Technology Fusion with code, including code for the Atlas mapping engine, to be licensed for use in a mobile application sold by Technology Fusion. (JA 125.) Kyle and McDougall agreed to split license fees equally. (JA 10, 142.) Over time, Bluguise (using the software development efforts of Kyle and defendant Edmund Zink) supplied Technology Fusion with additional code.

4

In 2011, a similar relationship developed between Bluguise and TFG, a technology services company founded by McDougall and his wife (and run jointly by the McDougalls), which allowed the McDougalls to pursue international and government contracts. (JA 58, 60-62, 69, 78-79, 80, 132.) TFG has two main projects: a subcontract with NorthStar to develop and test hardware and software integration for a modified helicopter platform (the "Pathfinder project"); and a similar government contract to develop and test hardware and software integration for a mission equipment computer for the United States government ("government project"). (JA 61-62.) From 2011 into 2013, Bluguise and Zink (through Bluguise) developed software for both TFG projects. (JA 63.)

Throughout this time, Bluguise (and Zink) were working for TFG as independent contractors. (JA 62-63.) Those independent contractor relationships were informal and oral.

On April 1, 2013, TFG hired Kyle as its Vice President of Engineering, hiring Zink as an engineer three months later. (JA 63, 66, 68.) TFG had a form "Agreement Concerning Protection of Confidential Information and Intellectual Property," which it presented to Kyle to sign. (JA 261.) Unlike TFG's other employees, Kyle refused to sign the agreement. (JA 64, 72-73, 278.) Indeed, TFG never required that he sign any employment contract or any agreement concerning non-competition, software ownership, or intellectual property rights. (JA 64, 72-73, 278.) Thus, at no point has

5

Bluguise or Kyle ever signed a written agreement assigning to TFG any ownership or intellectual property rights in the Bluguise code. (JA 78.) Kyle and Zink worked for TFG until it fired them both on February 28, 2014. (JA 158.)

*The Evidence of TFG's Alleged Source Code Problems*

TFG alleges that Appellants and Zink disrupted access to source code that TFG claims it needs to work on its Pathfinder and government projects. According to TFG, rather than writing and editing the code, then saving it on TFG servers, at some point Appellants and Zink began to remove elements of source code from the TFG servers, rendering it inaccessible to TFG. (JA 14.) In addition, TFG contends that it has been deprived of access to the code for the data server and also for Atlas/BluMap. (JA 7-23.) This, says TFG, has left it unable to perform any software or hardware alterations or upgrades to Pathfinder to meet contract requirements. (*Id.*)

At the hearing on TFG's Motion, TFG offered testimony from Ron Atkins and Michael McIntyre, two software engineers employed by TFG in May 2013 and April 2013, respectively. (JA 98, 101.) Atkins testified that source code for an "Army Project" "data server" was accessible to him when he began working for TFG, but that sometime in August 2013, it became inaccessible. (JA 94, 95.) Atkins testified that he did not know why code became unavailable. (JA 95.)

McIntyre testified that he worked as an independent contractor for TFG before becoming an employee in April 2013, and that, as a software developer, he reported to

Kyle while working on the Pathfinder project. (JA 101.) McIntyre also worked on the data server, integrating devices into the user interface. (JA 105.) McIntyre first gained access to Version 1.0 of the data server source code when he became a TFG employee, having not worked on the source code before. (JA 106, 114) McIntyre understood that Zink had written Version 1.0 before becoming a TFG employee, but had no idea how much Kyle had written. (JA 110, 114.)

McIntyre described difficulty he had with the data server source code. He testified that source code was kept in an SVN repository on servers owned by Bluguise (JA 114) and that SVN "keeps track of software changes and also allows multiple people to work on a single project." (*Id.*) The source code was accessible by TFG employees working on local copies on the TFG server. (JA 107.) The data server was upgraded to Version 2.0 during the second half of 2013, while Kyle and Zink were TFG employees. (JA 106.) After the development of Version 2.0.9, "parts of [the source code] went missing" while versions 2.0 through 2.08 remained available through a TFG server. (JA 107.) When McIntyre attempted to "sync with the data server" – a phrase he did not explain – "[i]t would say basically that files were deleted from" the "working local copy" of "this version or it would delete the files when you would do an update." (*Id.*) McIntyre also testified that passwords to access portions of the TFG server appeared to have been changed, something that could have been done by as many as three TFG employees, including Kyle and McIntyre. (JA 111.)

7

At the time of the hearing, TFG indicated that it was experiencing a problem with the integration of Atlas/BluMap that required a modification of BluMap. That, said McIntyre, either required having Bluguise's BluMap source code or completely rewriting the mapping engine code. (JA 104.) McIntyre acknowledged that Bluguise's Atlas/BluMap software was the "mapping engine we used for the navigation system." (JA 102.) He recalled that TFG employees "took part in meetings to make the mapping package what it is today" but never testified that any TFG employee wrote source code for Atlas/BluMap. (JA 103.) McIntyre acknowledged that he had not written any of that code. (JA 114.)

Both Atkins and McIntyre recalled having seen the Bluguise name and copyright notices appearing in code on the TFG server. (JA 96, 97, 99, 109.) When he asked Kyle why the Bluguise copyright notice was appearing, Atkins learned that Bluguise was Kyle's company. (JA 96-97.) McIntyre believed that Bluguise was a company that "Grant and Edd Zink had before joining TFG that was going to supply us with the mapping." (JA 109-10.) Atkins had no involvement with writing software for TFG before May 2013, and did not know who wrote software used by TFG before he joined in May 2013. (JA 46.)

*The Preliminary Injunction*

After hearing testimony from Atkins, McIntyre, and the McDougalls, and accepting into evidence the sworn declarations of Kyle and Zink, the district court

8

heard argument and suggested that it was considering granting an injunction based on what it perceived to be TFG's likelihood of success on its Virginia Computer Crimes Act claim. (JA 214.) However, the district court, and TFG too, struggled to define the terms and scope a possible preliminary injunction.

TFG's counsel acknowledged that, while his client owned the fruits of labor by its employees, it didn't own any software written by an independent contractor "unless we have a written agreement saying we own it." (JA 188.) And he acknowledged that "we don't" have such an agreement, "[s]o for purposes of this hearing we will leave that stuff to one side." (*Id.*) That was why, he explained, he had "attempted to focus [his] examination on what was being done while these people were employees because we do own that, and that is the source code we need." (*Id.*)

The district court implored counsel to "be specific" because "I'm going to have to create an order under Rule 65 that is specific. So if you're not specific, I can guarantee you it won't be in the order." (JA 189.) TFG argued that "the most important thing is the source code as I defined in discussing the first section for the data server for the NorthStar and US Army projects be made available to us so we can use it to fix our software." (JA 191.)

Further attempting to clarify its request, TFG argued that that "[w]e need the source code that [Kyle] wrote for our device drivers while he was our employee" but conceded that "[Kyle] owns Atlas," "he owns the mapping." (JA 202, 218.) Indeed,

9

even though McDougall testified that he had seen Zink "writing BluMap" code while he was a TFG employee (JA 155), and that TFG may "have some ownership interest in the upgrades to BluMaps," (JA 202-03), TFG acknowledged "[w]e are not asserting that here." (JA 203.)

Responding to Appellants' argument that TFG had failed to offer evidence that allowed the court to identify which code or files should be disclosed to TFG, which were owned by TFG and which were owned by Bluguise, the district court clearly wrestled with the difficulty of crafting an injunction that complied with Rule 65(d): "What file am I dealing with? What -- do I have to be that specific? What you have shown me now is that the best I can do and with specificity is order the defendants to provide some source code." (JA 163.)

At that point, TFG finally offered specificity: "It's not some source code. It's a source code for the data server....That's the source code we are missing. The source code for the data server." (JA 215.) Pressed again by the district court to offer more specificity, TFG gave more ground, arguing that what TFG was really sought was source code held in escrow, and that "[i]n order to be effective, it should be version 2.14." (JA 218.)

When the hearing resumed on July 11, 2014, the district announced it had decided to grant an injunction "not nearly as broad as what the plaintiffs received from the state court." (JA 300.) The district court explained that its injunction would "not

permit TFG to take anything away from [Appellants]. It will simply permit TFG to obtain the source code which TFG had developed with the help of . . . Bluguise so that they do not default on their contracts and potentially lose future customers, contracts and money." (JA 307.) But the Court then indicated that this would include "whatever [Kyle] modified and used and that prevents . . . TFG from accessing the various programs it needs to access," even source code indisputably owned by Bluguise, "if that program was used by Mr. Kyle when he was an employee at TFG." (JA 310-11.)

Ordering Kyle to the podium, the district court then warned him that if he failed to comply with the injunction:

> I can imprison you and I can fine you or I can fine you, and I'm not -- I just want you to know that that's the issue. And you would stay in jail, if I find you in contempt, until you comply with my order straightening out this situation with TFG.

(JA 313.)

On July 16, 2014, the district court entered an Order that requires Appellants, in part, "to supply the source codes, passwords and any other information that will fix the problems caused by Kyle, and which will allow TFG to properly use its computer systems." (JA 320.)

## SUMMARY OF THE ARGUMENT

The district court's preliminary injunction Order should be set aside because it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure. The Order is

impermissibly vague under Rule 65(d) of the Federal Rules of Civil Procedure because it fails to state the reasons why it was issued, does not state its terms specifically, and does not describe in reasonable detail the act or acts restrained or required. The Order lacks any meaningful limitation or direction permitting Appellants to ascertain the outer reaches of the conduct required, permitted, or prohibited.

Rule 65(d) required the district court to determine with reasonable specificity which files it was ordering Appellants to relinquish if they wished to avoid a contempt citation. Instead, the district court outsourced to TFG its duty to fashion a reasonably specific and precise injunction by ordering Appellants "to supply the source codes, passwords and any other information that will fix the problems caused by Kyle, and which will allow TFG to properly use the computer systems." That Order gave TFG carte blanche to demand any files it desires from Appellants, without regard for whether TFG is owns those files or had shown any need for them.

## **ARGUMENT**

This Court reviews "the grant or denial of a preliminary injunction for abuse of discretion, recognizing that 'preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances.'" *Microstrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 806

12

(4th Cir. 1991)). The Court's review "is even more searching when the preliminary injunctive relief ordered by the district court is mandatory rather than prohibitory in nature." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003); *see Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) ("Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances.").

An injunction that does not apply the preliminary injunction standard correctly may be reversed as an abuse of discretion. *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013); *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc). That standard can be found in Federal Rule of Civil Procedure 65:

> Every order granting an injunction and every restraining order must:
>
> (A) state the reasons why it issued;
> (B) state its terms specifically; and
> (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.

FED. R. CIV. P. 65(d)(1). "These terms are mandatory and must be observed in every instance." *Alberti v. Cruise*, 383 F.2d 268, 271-72 (4th Cir. 1967) (citing *Mayflower Industries v. Thor Corp.*, 182 F.2d 800 (3d Cir. 1950)).

"The specificity provisions of Rule 65(d) are no mere technical requirements." *CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456, 459 (4th Cir. 2000):

13

> The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood. Moreover, without specificity, appellate review of an injunctive order is greatly complicated, if not made impossible. Rule 65(d) thus serves the twin purposes of providing fair notice of what an injunction requires and of facilitating appellate review.

*Id.* (citations omitted.) "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

The district court's Order plainly falls short of satisfying the second and third clauses of Rule 65(d). Nowhere was the court "specific" in outlining the "terms" of the injunctive relief granted; nor can it be said that the Order describes "in reasonable detail . . . the act or acts sought to be restrained." Rather, in paragraph (c) of the Order, Appellants are

> ordered to supply the source codes, passwords and any other information that will fix the problems caused by Kyle, and which will allow TFG to properly use the computer systems.

(JA 320.) No further detail, definition, or instruction is provided. Appellants have been left with one short paragraph, rife with uncertainty.

For starters, the Order does not define "source codes." Does the Order cover software involved in TFG's government contract project or simply NorthStar's Pathfinder project? And which source code must Appellants turn over? Is it merely the

14

data server, as TFG at one point argued? And if so, which version? Is it "Version 2.14" or something more? And does the Order require Appellants to provide specific, limited files, or the entirety of its source code library? The Court gave no clue to what should be turned over, failing to even identify specific modules or programs that fell within the sweep of its injunction.

The remainder of paragraph (c) is similarly vague. The Order fails to even hint what "other information" is at issue. From the bench, the district court mentioned "all the other documents they had when they applied to the TFG products that they had when they left there" (JA 310), but the court never elaborated on that concept, explained the reference, or addressed it in the Order. Appellants are left unable to discern what "other information" is at issue.

Similarly, the Order does not specify what "TFG computer systems" means. Does that mean computer software? Does it only apply to TFG servers in Williamsburg, or does it apply to Bluguise's SVN repository? And what constitutes "proper use" of a computer system? If TFG finds a bug or glitch in Kyle's code that must be repaired, does that deprive TFG of "proper use"? What if its engineers cannot fix the glitch, is it then unable to properly use its computer system? And are Appellants then required to provide support?

At no point did the Court identify or delineate the "problems" which were "caused by Kyle." More importantly, the Order does not specify how or when a

15

"problem" is "fix[ed]." Does "fix" mean Appellants must comply with TFG's demands until its contracts are complete? If Appellants take issue with a demand for compliance, is Kyle risking imprisonment? Whatever compliance they make, are Appellants permitted to retain copies of the source code?

This Court has recognized that ambiguities in a preliminary injunction may "indicate that the district court has not described the enjoined conduct 'in reasonable detail,' and [that] the order therefore violates Rule 65(d)." *Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013). Other courts have agreed. For example, the court in *Johnson v. Jassi Dhillon Inc.*, 2012 U.S. Dist. LEXIS 103244 (E.D. Cal. July 24, 2012), refused to enter a proposed injunction that would have required the defendant to provide "the correct number and type of properly configured, van-accessible disabled parking spaces, an accessible route to an accessible entrance, accessibility signage and striping signage and accessible restrooms." *Id.* at *1. That injunction, said the court, "does not provide any specifics about what defendant is required to do or to refrain from doing," *id.* at *3-4, and a "[d]efendant should not have to guess what is required, [but] should be able to tell what is required from reading the injunction itself." *Id.* at *4 n.1. *See also McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 283-84 (5th Cir. 2008) (noting that injunctions that include vague terms, such as "take all necessary steps to remedy the effects of past discrimination," have been found to violate Rule 65(d)).

Simply reading the Order gives Appellants no basis to divine what is required of them, what actions Kyle must take to avoid, as the district court so clearly stated, being imprisoned until such time as he complied with the order to "straighten . . . out this situation." (JA 313.) Nor can the problems in the Order be resolved by reference to the record. To be sure, context can inform the interpretation of an injunction. But even where that context exists, a vague injunction cannot be upheld. *Howard Opera House Assocs. v. Urban Outfitters, Inc.*, 322 F.3d 125, 130 (2d Cir. 2003). Here, where the record does not provide helpful context or specificity, the injunction must be set aside.

In *Urban Outfitters*, the district court enjoined a retail tenant from "operating the sound system in the Store in a manner that substantially and unreasonably interferes with other tenants' use of their space in the [shopping center]." *Id.* The Second Circuit vacated the injunction, finding that "[o]n its face, [it] lacks the reasonable detail required by [Rule 65(d)]." *Id.* And, while the district court had noted that "there is more than sufficient context in this case to inform [the tenant] of the precise steps it must take to conform with the Order," "[t]he very fact that the district court has at its disposal a body of information that it can use to tailor the injunction is all the more reason to require it to do so." *Id.*

But here even that context is missing. Indeed, one of the reasons for the vagueness in the Order is that the district court simply lacked facts at its disposal to

grant an injunction that complied with Rule 65(d). The evidence of what source code allegedly had been removed, altered, retitled or otherwise put out of TFG's reach was uniformly generalized. Indeed, it is telling that, when asked to specify the source code at issue, TRG's counsel juggled conflicting descriptions that lacked evidentiary support, referring alternatively to "what was being done while these people were employees . . . that is the source code we need" (JA 188), unspecified problems with "the data server for the NorthStar and US Army projects" (JA 191), "the source code that [Kyle] wrote for our device drivers while he was our employee" (JA 202), and a data server "version 2.14" that had never been mentioned in the parties' pleadings or in evidence. (JA 218.)

Similarly, there was no testimony identifying "any other information" that appeared in the Order. Not one witness explained which "computer systems" became inoperable, how that happened, or how the "problems" could be "fixed." And without such evidence, the district court was unable to make a finding of what those problems allegedly were. Given that, it could not enter an injunction properly tailored to the perceived violation. *See e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 603-06 (7th Cir. 2007).

Nothing said during the hearing provides clarity to the court's injunction concerning "source codes" and "computer systems." TFG had clearly acknowledged that, having no written assignment of rights, it did not seek any source code written by

18

Kyle or Zink before their employment with TFG began. Thus, TFG repeatedly stressed that, because Kyle "owns Atlas" and "owns the mapping," "we will leave that stuff to one side." (JA 188, 202, 218.) All it sought, said TFG, was "the source code that [Kyle] wrote for our device drivers while he was our employee." (JA 202.)

And yet the Order contains no such limitation. If anything, the court's bench commentary suggests that the "limited" injunction it envisioned indeed covers Atlas and every other piece of software Kyle wrote and exclusively owns. (JA 307, 310-11.) And not only are Appellants required to "return" their own property to TFG, there is no mechanism providing for such a return of files, or for their reclamation by Appellants. Are Appellants required to license their works to TFG? On what terms?

The Order lacks any meaningful definition or limitation whatsoever. And with Kyle given the choice of compliance or possible imprisonment, the Order operates as a blank check for TFG. It empowers TFG to demand from Appellants any source code or "other information" without regard for the proof offered by TFG or the Court's own explanations of its intent. Although the Court was acutely aware of the need for specificity, and was initially reluctant to grant an injunction merely to "provide some source code" (JA 163), ultimately it did just that. The Court abdicated its responsibility to set forth in reasonable detail what was required of Appellants, and instead enjoined Appellants do to what TFG said was required.

The district court had indicated at the hearing that if TFG was not specific, there would be no specifics in the order. Given TFG's lack of specificity, the district court should have denied TFG's Motion, finding TFG had failed to satisfy the high burden required for a mandatory preliminary injunction. Instead, the district court left it to Appellants to guess what is required of them. Rule 65(d), binding precedent, and fundamental fairness require more specific, precise language when a party is threatened with the marshal "measuring Mr. Kyle for a jail cell" if he fails to "fix the problems" he allegedly caused. (JA 217, 320.) Having misapplied Rule 65(d), the district court's Order should be vacated.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that the July 16, 2014, Order of the district court be vacated and that the case be remanded for further proceedings consistent with the requirements of Rule 65(d).

/s/ W. Randolph Robins, Jr.
Robert M. Tyler
W. Randolph Robins, Jr.
SPOTTS FAIN, PC
411 East Franklin Street, Suite 600
Richmond, Virginia  23219
(804) 697-2000

*Counsel for Appellants*

20

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*4,851*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>September 29, 2014</u>      <u>/s/ W. Randolph Robins, Jr.</u>

                                        *Counsel for Appellants*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 29th day of September, 2014, I caused this Brief of Appellants and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> John M. Bredehoft
> KAUFMAN & CANOLES, PC
> 150 West Main Street, Suite 2100
> Post Office Box 3037
> Norfolk, Virginia 23514
> (757) 624-3225
>
> *Counsel for Appellee*

I further certify that on this 29th day of September, 2014, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ W. Randolph Robins, Jr.
*Counsel for Appellants*